## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karin R.,                                          Case No. 20-cv-1994 (TNL)

       Plaintiff,

v.                                                        **ORDER**

Andrew Saul,
Commissioner of Social Security,[1]

       Defendant.

---

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, #890, Minneapolis, MN 55401 (for Plaintiff); and

Linda H. Green, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Karin R. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.*  The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul.  A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name."  Fed. R. Civ. P. 25(d).

This matter is before the undersigned on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 23, and the Commissioner's Motion for Summary Judgment, ECF No. 25.  Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **GRANTED IN PART** and **DENIED IN PART**; and this matter be remanded to the Social Security Administration for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that she has been disabled since October 2015 due to, among other impairments, neuropathy in her upper and lower extremities, a bulging/herniated disc, depression, anxiety, arthritis, bursitis and bone spurs in her shoulder, chronic pain syndrome, back problems, and fibromyalgia.  Tr. 411-12, 426-27, 441-44, 456-57.  Plaintiff's applications were denied initially and again on reconsideration.  Tr. 10, 424, 439, 441-42, 455, 468-69.

Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 10, 492-93.  The ALJ held a hearing in November 2019, and issued an unfavorable decision.  Tr. 10-22, 379-410.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-6.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 23, 25.  This matter is now fully briefed and ready for a determination on the papers.

## III. STANDARD OF REVIEW

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidence is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (per curiam) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

## IV. ALJ'S DECISION

The ALJ found that Plaintiff had the severe impairments of degenerative disc disease in her lumbar and cervical spine, chronic pain syndrome, and bilateral carpal tunnel syndrome status-post repair.  Tr. 12.  The ALJ additionally found that Plaintiff's "medically determinable mental impairments of factitious disorder, depression, anxiety,

and personality disorder" when considered individually or in combination did "not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and [we]re therefore non[-]severe."  Tr. 13.  The ALJ next concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 14-15.

The ALJ further determined, in relevant part, Plaintiff had the residual functional capacity to perform light work with the additional limitations that she could "[f]requently handle and finger with the right dominant hand and occasionally finger and handle with the left hand."  Tr. 15.

Based on the testimony of the vocational expert, the ALJ found that Plaintiff was capable of performing her past work as a registered nurse supervisor as well as, in the alternative, the representative jobs of cashier and mail-room clerk.   Tr. 20-22.  Accordingly, the ALJ concluded that Plaintiff was not under a disability.  Tr. 23.

## V. ANALYSIS

Plaintiff's assignments of error are directed at the ALJ's determination of her residual functional capacity.  Plaintiff asserts that the ALJ's decision is unsupported by substantial evidence because the ALJ (1) "failed to properly consider the physical opinion evidence and erroneously rejected the handling and fingering limitations opined by every medical opinion" and (2) "failed to develop the record and instead utilized his lay knowledge to determine that Plaintiff's mental limitations did not require any limitations within the [residual functional capacity]."  Pl.'s Mem. in Supp. at 1, ECF No. 27.

5

### A. Residual Functional Capacity

A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F.4th 1353, 2022 WL 696974, at *5 (8th Cir. Mar. 9, 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at *5 (quotation omitted). Nor is

an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c).

### B. Reaching, Handling & Fingering Limitations

#### 1. Medical Evidence

Plaintiff has a history of chronic pain, including in her lower back, neck, and upper and lower extremities. *See, e.g.*, Tr. 693, 776, 774, 1256, 1365, 35. Plaintiff injured her left wrist in or around 2004 or 2005, and then again in 2009. *See, e.g.*, Tr. 1061. Plaintiff had "some deficits related to thumb motion" as a result, but "was functional after these injuries and had minimal pain." Tr. 1061. Plaintiff fell in December 2015 and again in August 2016, which "impacted [her] left hand," "specifically the ulnar distribution of the hand was numb." Tr. 1061. In early June 2015, Plaintiff was seen at the clinic for a follow-up appointment related to several health issues, including depression. Tr. 830. Plaintiff was noted to be "very somatic and expansive." Tr. 830; *id.* ("Many somatization."); *see also* Tr. 817.

#### a. 2016

In early January 2016, Plaintiff had a rheumatology consultation, "report[ing] pain in her neck, hands, elbows, lower back, [and] left lower extremity." Tr. 693; *see also* Tr. 699. Plaintiff "report[ed] stiffness all over her body which can last over 3 hours" as well as swelling in her hands and feet. Tr. 693; *see also* Tr. 699. Repetitive activities such as

vacuuming and sweeping increased her pain.  Tr. 693, 699.  Upon examination, Plaintiff

had full strength in her upper extremities as well as full range of motion.  Tr. 696; *see*

*also* Tr. 702.  It was noted that "[f]ist is 100 percent with good grip strength."  Tr. 696;

*see also* Tr. 702.  There was no synovitis.  Tr. 696; *see also* Tr. 702.

At the end of March, Plaintiff had a follow-up primarily related to her lower back

pain.  Tr. 772.  Plaintiff's treatment provider noted a diagnosis of chronic pain syndrome,

stating:

> Very difficult type of pain to manage as this is not consistent
> and each visit has a new pain in a new place[. N]eurology,
> rheumatology, psychology all have been consult[ed. Physical
> therapy visit] 'was a waste of time[.]'
>
> [Plaintiff] has not followed through with previously-
> suggested stretching/strengthening exercises, yoga, or ice, and
> has declined joint injections.  She has been sent to multiple
> specialists who have been unable to find an organic cause for
> her complaints of extreme pain.  While I was explaining that I
> did not know where else to send her, [Plaintiff] became angry
> and tearful.  She quickly stood up, bent over to pick up her
> jacket and purse, swung her purse over her shoulder, picked
> up an item she dropped on the floor, and stated, "I guess I'm
> just going to have to go somewhere else," leaving the exam
> room.

Tr. 772.  An unspecified personality disorder was included among Plaintiff's diagnoses

"[p]er psychiatry notes" and Plaintiff's treatment provider stated that she did "not think

we can make any progress and I am unable to meet her needs."  Tr. 772.  Plaintiff's

medications were "refilled for the next 30 days to give her time to find another provider."

Tr. 77.

Towards the end of August, Plaintiff was seen by William J. Durie, MD, to establish care. Tr. 1105. Plaintiff reported that a disc in her neck resulted in "pain into the right shoulder, with some numbness in the thumb and index finger of [her] right hand, which has been spreading." Tr. 1105. Plaintiff also reported "some tingling in her left hand." Tr. 1105.

At a follow-up visit approximately one month later, Plaintiff reported that "if she sits leaning forward with her head tipped back slightly, her right arm will go tingly and numb." Tr. 1098. Plaintiff also reported that it takes approximately two to three hours "for the feeling to come back" when she wakes up in the morning. Tr. 1098. Additionally, Plaintiff reported injury to her left thumb when she "tripped while carrying an armload of brush [and] pinched [her] thumb" and her right index finger, which she twisted while holding her dog and then subsequently pinched. Tr. 1098. Plaintiff was also experiencing discomfort in her left wrist, reporting that "[t]he distal ulna seems 'not connected.'" Tr. 1098.

Dr. Durie noted that Plaintiff was "able to nearly fully flex and extend" her right finger. Tr. 1098. Dr. Durie also noted that an April 2016 MRI showed "broad-based annular bulging [at] C5-C6 mildly compressing both C6 nerve roots in the neural foramina" as well as "broad-based annular bulging [at] C6-C6 [sic] mildly flattening the ventral aspect of the subarachnoid space and mildly impinging on both C7 nerve roots." Tr. 1098. Dr. Durie diagnosed Plaintiff with cervical radicular pain, and referred her to physical medicine and rehabilitation. Tr. 1099. He also noted that an injection could be considered and Plaintiff may need a neurosurgical referral. Tr. 1099. Plaintiff later

cancelled the appointment with physical medicine and rehabilitation "because she felt she had already tried injections, and was reluctant to start all over again." Tr. 1096.

Plaintiff saw Dr. Durie again at the end of October. Plaintiff reported "numbness of the thumb and first two fingers of [her] right hand, and the 5th and 1/2 of the fourth finger of [her] left hand." Tr. 1095; *see id.* ("5-6 weeks ago she developed numbness in the left pinky ulnar side of the 4th finger. Has had subsequent weakness in the hand, hard to hold things."). Plaintiff reported having "no strength in her hands," "trouble opening up ziplock bags," and being unable to "hold dishes when she washes them." Tr. 1095. Plaintiff also reported tremors in her hands. Tr. 1095.

Dr. Durie noted that the sensation in Plaintiff's left hand over the fifth and ulnar aspect of her fourth finger was decreased where as it was "[n]ormal on the radial [fourth] finger." Tr. 1096. Plaintiff had "[s]ubjectively decreased sensation over the thumb and first two fingers" of her right hand, which she reported "fe[lt] 'a little heavy.'" Tr. 1096. Dr. Durie referred Plaintiff to neurosurgery and noted that he needed to obtain the results of EMG of Plaintiff's right arm that had been conducted at a different facility and he "would . . . consider getting an EMG of [Plaintiff's] left upper extremity, looking for an ulnar neuropathy." Tr. 1097.

In mid-November, Plaintiff followed up with Dr. Durie to discuss the results of the EMG of her right arm. Tr. 1092. Dr. Durie noted that the EMG showed "[m]oderate right carpal tunnel syndrome" and "moderate right cubital tunnel syndrome." Tr. 1092. Dr. Durie also ordered an EMG of Plaintiff's left arm as Plaintiff "had developed symptoms subsequent to her last EMG." Tr. 1093.

10

In early December, Plaintiff saw Dr. Durie following an emergency-room visit earlier that day.  Tr. 1087; *see* Tr. 757-59 ("[Plaintiff] states she tried to shovel yesterday which is what may have exacerbated [symptoms].").  Plaintiff was "[v]ery upset."  Tr. 1087; *see also* Tr. 757-58.   Among other things, Plaintiff reported that her pain was "unbearable" most days and nights; she was not sleeping; and she was "barely able to take care of herself."  Tr. 1087.  Plaintiff was "[f]rustrated that a prior provider put in her chart that she was borderline and faking symptoms."  Tr. 1087.  *See infra* Section V.C.1.b.  Plaintiff reported that "[h]er face, arms and [h]ands swell when she wakes in the morning."  Tr. 1087.  Plaintiff requested x-rays of her right index finger and left thumb.  Tr. 1088-90.  The x-ray of Plaintiff's right index finger was unremarkable.  Tr. 1089.

Approximately one week later, Plaintiff was seen in the pain management program for, in relevant part, bilateral upper extremity tingling and numbness.  Tr. 1085.  Plaintiff reported that her symptoms had been "[g]etting progressively worse in the last few months."  Tr. 1085.  Plaintiff reported that she had previously received "[u]pper back trigger point injections," which were "extremely helpful," but the numbness still returned.  Tr. 1085.  It was noted that Plaintiff was independent with her activities of daily living.  Tr. 1086.

Upon examination of Plaintiff's upper extremities, it was noted that:

> [R]ight carpal tunnel signs are positive.  Left side is negative.
> Patient reported paresthesias in left ulnar distribution.
> Spurling test is negative on both sides.  Upper extremities –
> otherwise no focal weakness.  Reflexes are +2, symmetric.
> Hoffman's is negative.  No signs of cord compression.

11

Tr. 1086.  In relevant part, a referral was made for an "ultrasound-guided right carpal tunnel steroid injection" and prescriptions given for a right carpal tunnel splint and a left ulnar gutter split.  Tr. 1086.  Exercises for her hands were also prescribed.  Tr. 1086.

### b.  2017

In early January 2017, Plaintiff saw Dr. Durie in connection with a pre-operative evaluation.  Tr. 1080.  Dr. Durie noted that a neurologist advised Plaintiff following an EMG a few days earlier that "she needed to have surgery as soon as possible, problem with the ulnar nerve" and Plaintiff was "[n]oted to have wasting of the thenar eminence and wasting on the back of her hand."  Tr. 1080.  Plaintiff also reported "decreased left hand strength over the past couple of months."  Tr. 1080.

A few days later, Plaintiff was seen in orthopedics regarding numbness and weakness in her left hand, primarily "going up into her [fourth] and [fifth] fingers."  Tr. 704-05.  Plaintiff also reported "significant lost off strength in her hand and atrophy of the muscles."  Tr. 705.  Upon examination, her

> [s]ensation [was] diminished subjectively in the [fourth] and [fifth] fingers although able to localize and tell me that I am touching the fingers.  She has a positive Tinel's at the cubital tunnel.  She has severe intrinsic muscle atrophy with finger abduction weakness.  She had a mildly positive carpal tunnel compression test.

Tr. 707.  Plaintiff was diagnosed with "severe ulnar nerve entrapment [at] the cubital tunnel and moderate entrapment at Guyon's canal as well as mild entrapment of the median nerve at the carpal tunnel."  Tr. 707.  "Given the severity of her nerve entrapment," it was recommended that she "proceed[] directly with surgery."  Tr. 707.

Plaintiff "underwent surgery on her left arm (cubital tunnel and carpal tunnel)" on January 20. Tr. 1075; *see* Tr. 708; *see also* Tr. 715-17. Post-operative notes indicate that Plaintiff's range of motion and lifting would be limited "for two weeks until her incisions are healed and then will get her started on gentle range of motion after that." Tr. 717. Plaintiff ran out of pain medication four days later and "was not happy" when told her narcotic prescription would not be renewed. Tr. 708; *see also* Tr. 711 ("Upon hearing this, [Plaintiff] and her companion became very agitated and upset, they did both launch into an expl[e]tive laced tirade focused on me with numerous insults directed at me."). Upon examination, "everything [wa]s intact with [Plaintiff's] dressing and her postsurgical wounds." Tr. 711. Plaintiff did have "[s]ignificant tenderness to palpation over [her] medial elbow at the site of [the] cubital tunnel release[ and] very mild tenderness over [the] carpal tunnel." Tr. 711.

During an appointment with Dr. Durie in early February, he noted that Plaintiff's incisions were "healing nicely" and she "demonstrate[d] full range of motion without restriction." Tr. 1076. Plaintiff did have "[s]ome numbness by [her] elbow incision." Tr. 1076.

When Plaintiff was next seen in pain management at the end of March, she reported that she has had hypersensitivity in her left elbow and "persistent left hand weakness, especially difficulty making a grip" since her surgery. Tr. 1071-72. Hypersensitivity and "left hand grip weakness, especially ulnar innervated muscle weakness," were noted upon examination of Plaintiff's left arm. Tr. 1072. Plaintiff was referred to "occupational therapy for left hand intrinsic muscle strengthening" and

"desensitization [of her] left elbow."  Tr. 1072.  Carpal tunnel splints and exercises were also recommended for the carpal tunnel in Plaintiff's right hand.  Tr. 1072.

In early May, Plaintiff was seen in occupational therapy related to her left upper extremity.  Tr. 1061.  Plaintiff reported that she had sensitivity over the scar over her left elbow following her surgery "as well as sensitivity within the hypo thenar region of [her] left hand."  Tr. 1061.  Plaintiff felt that her range of motion was "intact" overall, but was concerned over "decreased dexterity and function of [her] left hand[] as well as decreased strength for everyday activities."  Tr. 1061.  Plaintiff rated her pain at 5 out of 10 on a consistent basis.  Tr. 1061.

Plaintiff

> report[ed] increased difficulty related to grooming, dressing; specifically, donning, doffing her bra and pants, as well as opening medication bottles; sleep; cleaning; cooking; laundry; grocery shopping; opening jars and cans; lifting; using tools; typing activities; reaching; use of a cell phone; as well as any gardening or recreational activities, as well as opening windows and driving.

Tr. 1062.  It was noted that Plaintiff was living with her significant other, rabbits, four dogs, a cat, and chickens.  Tr. 1062; *see also* Tr. 1038 ("liv[ing] with her boyfriend and her 4 dogs, as well as a cat, chickens and numerous rabbits, as [Plaintiff] breeds these").  When asked about the goals of treatment, Plaintiff stated that she was unsure if there was permanent damage; wanted "[a] detailed letter, so I can add to my Disability application"; and "[w]ould love complete healing."  Tr. 1062.

Upon examination, it was noted, among other things, that Plaintiff "does have a compensatory strategy related to increased wrist extension on the left side, perhaps

related to past fracture of [her] wrist." Tr. 1062. Plaintiff also "ha[d] abnormal movement of [her] left thumb in certain positions with flexion and extension of [her] wrist related to reattachment of [the] tendon." Tr. 1062. Plaintiff was, however, "able to use [her] thumb functionally." Tr. 1062. It was recommended that Plaintiff undergo a course of occupational therapy to increase grip strength and activity tolerance. Tr. 1062-63.

Plaintiff had one additional session of occupational therapy. Tr. 1050. During this second visit, Plaintiff continued to report hypersensitivity in her left arm as well as "increased softness within [her] left elbow scar." Tr. 1049. Plaintiff rated her pain at 0 out of 10. Tr. 1049.

Around the same time, Plaintiff had another consultation with a pain management program. Tr. 1045. Plaintiff wanted to "improve her ability to function," including "driv[ing] longer distances, return[ing] to exercise, walking the dogs, cleaning the house, and getting back to yard work and kayaking." Tr. 1045. Plaintiff reported that she was independent with her activities of daily living, but "ha[d] difficulty showering, changing her clothes, and brushing her teeth." Tr. 1047. Plaintiff also received assistance from her significant other with other activities. Tr. 1047. Among other things, it was noted that Plaintiff "r[ose] easily from a seated to standing position" and had "some trigger points in the right upper trap and in the interscapular region as well as sensitivity over the right sacroiliac joint." Tr. 1047. Plaintiff's range of motion in her "cervical spine is fully intact in flexion, extension, rotation, and bilateral bending without pain in the end ranges." Tr. 1047. The strength in her upper extremities was "5/5" and "[g]rasp [was]

15

4+ out of 5 on the right and 4 out of 5 on the left." Tr. 1047. It was similarly recommended that Plaintiff undergo a course of physical and occupational therapy as well as counseling. Tr. 1047.

During her occupational therapy evaluation, Plaintiff reported that her neck pain improved with physical therapy. Tr. 1038. Plaintiff cited low back pain as "her main concern and biggest problem." Tr. 1038. Plaintiff "report[ed] that initially she thought that right shoulder pain and scapular pain was related to her neck pain; however, as her neck pain has gotten better, she continues to have right shoulder pain." Tr. 1038. Plaintiff "experience[d] some numbness within her fingertips on the right side" and "state[d] that her left arm and elbow is about the same, related to cubital tunnel and carpal tunnel releases." Tr. 1038. Plaintiff rated "her pain currently [at] a 2/10, which is a good day, and on a bad day, 6 to 7 out of 10." Tr. 1038.

When describing her current functioning, Plaintiff reported that she has "had to adapt quite a few bathroom activities related to left arm pain related to reaching her back and holding onto soap." Tr. 1038; *see also* Tr. 1038 ("does have to make minimal to moderate modifications with her everyday activities due to her pain and decreased strength within [her] left arm, as well as right shoulder pain"). Plaintiff "usually uses elastic pants, as fasteners are difficult for her but she is independent with dressing." Tr. 1038. Plaintiff also reported "increased pain with washing dishes, cooking, as well as mopping, sweeping, and vacuuming"; "difficulty with folding items[,] due to dexterity and strength within [her] left upper extremity"; and "increased pain with lifting and moving objects from the floor, waist level, and overhead." Tr. 1038. Plaintiff was no

longer able "to complete as much yard work" and experienced increased pain in her left arm when using turn signals while driving.  Tr. 1038.

Upon examination, Plaintiff's grip, lateral pinch, and Palmar pinch strength were greater in her right hand than in her left.  Tr. 1039.  It was also noted that Plaintiff "demonstrate[d] mild pain behaviors."  Tr. 1039.  Treatment goals centered around posture, body mechanics, stress management for pain management, pacing principles, and lifestyle changes for pain management.  Tr. 1039.

During a physical therapy evaluation the same day, Plaintiff similarly reported that her neck pain improved with physical therapy, but that she was still experiencing pain in her right shoulder.  Tr. 1036.  Plaintiff reported "difficulties with raising her shoulder over 90 degrees into flexion and abduction."  Tr. 1036.  Plaintiff was able to wash dishes "5 to 10 minutes at a time with breaks in between," but "unable to do any heavy activities such as moving furniture[ and] carrying laundry."  Tr. 1036.  Vacuuming, mopping, and sweeping were also "very difficult."  Tr. 1036.  Plaintiff's pain was a 7 out of 10 at the highest, 3 at the lowest, and 5 on average.  Tr. 1036.

Upon examination, Plaintiff's range of motion in her right arm was limited, "especially after 120 degrees of flexion and abduction."  Tr. 1037.  "External rotation [was] limited to 20 degrees and 90 degrees of abduction."  Tr. 1037.  Plaintiff "demonstrated some discomfort eccentrically when coming down."  Tr. 1037.  Plaintiff was able to lift 15 pounds from the floor and overhead lift 10 pounds.  Tr. 1037.  Physical therapy treatment goals included improving flexibility, stability, and strength so as to

improve endurance as well as pacing and activity modification to improve Plaintiff's functioning and ability to complete chores. Tr. 1037.

Plaintiff had a rheumatology consultation in early September. Tr. 1025. Among other things, Plaintiff reported "bad cramping in the arms and fingers due to nerve damage and muscle loss due to ulnar nerve entrapment" with "some improvement" after her surgery in January. Tr. 1026. Plaintiff had recently fallen in her chicken coop, causing pain in her thumbs. Tr. 1026. Additionally, Plaintiff reported "right shoulder and right elbow pain, numbness in the [first] 3 fingers." Tr. 1026. Plaintiff did not experience relief of her symptoms with carpal tunnel injections. Tr. 1026.

Plaintiff was noted to have full muscle strength and "[g]ood muscle tone without atrophy." Tr. 1029. Tinel's sign was also negative. Tr. 1029. Plaintiff had normal range of motion in her shoulders, elbows, and wrists. Tr. 1029. Plaintiff's hands were noted to be normal with mild degenerative changes and some mild enlargement at the nodes of her fingers. Tr. 1029. It was also noted that Plaintiff had a "[g]ood grip." Tr. 1029. There was "no finding . . . of joint inflammation." Tr. 1030.

In mid-September, Plaintiff went to the emergency room after she fell in her chicken coop. Tr. 753. Plaintiff had some "bony tenderness" on her right wrist, but otherwise exhibited "normal range of motion, no swelling, no effusion, no crepitus, no deformity and no laceration." Tr. 754.

A few days later, Plaintiff had an EMG of her right arm. Tr. 1014. It was noted that there was "[r]ight median sensorimotor neuropathy at or distal to the wrist," which was "compatible with [a] diagnosis of carpal tunnel syndrome of moderate severity";

18

"[m]ild right ulnar sensory neuropathy that . . . [could not] be localized at this point because [the] ulnar motor nerve response [wa]s completely normal"; "no evidence of denervation process in [the] distal ulnar innervated muscles"; and "no EMG evidence of right cervical radiculopathy." Tr. 1014. An orthopedics referral was recommended for further treatment. Tr. 1014.

During an occupational therapy appointment at the end of September, Plaintiff reported increased right elbow pain. Tr. 1009. Plaintiff also had increased symptoms during the session with resisted wrist extension. Tr. 1010. The same day, Plaintiff also had an appointment with pain management. Tr. 1008. The strength in Plaintiff's right arm was noted to be "4+/5 throughout" and grasp was "4+/5." Tr. 1008. Plaintiff was positive for shoulder impingement on the right and "tender to palpation over the right lateral epicondyle." Tr. 1008. Spurling's test was negative and Plaintiff's deep tendon reflexes were "+2 and symmetric." Tr. 1008. Plaintiff was referred to orthopedics for right median nerve entrapment and right shoulder impingement. Tr. 1009.

In early October, Plaintiff was seen by orthopedics. Tr. 1005. She reported "problems with pain that radiates from her neck down the right side of her arm into her fingers" as well as intermittent numbness and tingling in the first through third fingers of her hands over several years. Tr. 1005. A carpal tunnel injection in January resulted in "some improvement in her wrist, numbness and tingling in her [first] through [third] fingers at that point in time." Tr. 1005. Plaintiff reported that the surgery on her left arm improved "much of her symptoms" on that side. Tr. 1005. Plaintiff also "complain[ed]

19

of right shoulder pain," stating "[i]t is difficult to lift her shoulder above the level of her eyes in forward flexion or abduction." Tr. 1005.

Upon examination, Plaintiff's neck was noted to have "mild paraspinal muscle tenderness and spasm on the right." Tr. 1005. Spurling's test was "mildly painful to the left" with associated "[m]ild trapezius spasm." Tr. 1005. Plaintiff had normal range of motion in her shoulders, "although there was "pain beyond 90 degrees of forward flexion and extension." Tr. 1005. "Impingement signs [we]re positive." Tr. 1005. "Evaluation of [Plaintiff's] wrist reveal[ed] negative Tinel, but positive Phalen." Tr. 1005. Plaintiff's "[g]rip strength and pincer strength [wa]s normal." Tr. 1005.

A repeat MRI was ordered of Plaintiff's cervical spine since the last one was "a couple of years ago." Tr. 1006. Plaintiff's right shoulder pain was "consistent with rotator cuff tendinopathy." Tr. 1006. As for the numbness in Plaintiff's right wrist and hand, this was noted to be consistent "with carpal tunnel" and a repeat injection was recommended. Tr. 1006.

During an occupational therapy appointment two days later, Plaintiff expressed "frustration related to ongoing symptoms within her right arm and needing an MRI to see if her neck is impacting [her] right arm symptoms." Tr. 1004. Plaintiff reported increased pain in her right elbow and it was noted that she was "wearing a forearm strap." Tr. 1004. Plaintiff did not think that the forearm strap fit well, but it did "help decrease pain." Tr. 1004. Plaintiff additionally reported "difficulty picking up a cup or glass" and increased pain with wrist extension. Tr. 1004. Mild swelling was noted in Plaintiff's right elbow and she "demonstrate[d] no significant pain behaviors." Tr. 1004. At her

next occupational therapy appointment one week later, Plaintiff reported an increase in pain and that "her right forearm [wa]s feeling a little bit better." Tr. 998. Plaintiff was also "aware of how increased stress, decreased sleep quality and increased pain impact[ed] each other." Tr. 998. A note from a different provider the same day stated that Plaintiff "was getting out of the house more, which has been good for her emotional health as long as she paces her activities." Tr. 997.

During a physical therapy appointment a few days later, Plaintiff continued to report pain in her right elbow, but "noted that she did a lot of heavy lifting." Tr. 995. A couple of days later, however, Plaintiff was "frustrated" and feeling "defeated" due to having more pain in her right upper quadrant and arm as well as her lower back. Tr. 991. Plaintiff expressed similar feelings in another session. Tr. 987; *see also* Tr. 983. Tension was noted in her upper trapezius and her cervical range of motion was greater on the right than the left. Tr. 987.

During a pain management appointment towards the end of October, Plaintiff "expressed concern that her pain complaints [we]re not being believed or addressed adequately." Tr. 981. This was "discussed . . . at length." Tr. 981. No opioid medication would be recommended as Plaintiff was participating in the program "to learn non-opioid related strategies for pain management." Tr. 982. It was also explained that there was "little else to offer in terms of medication management" beyond Plaintiff's current regimen. Tr. 982. Plaintiff was offered an early discharge from the pain management program, but elected to stay. Tr. 982.

Additionally, the results of Plaintiff's cervical MRI were discussed. Tr. 982. "Mid[-]cervical degenerative changes" were noted "without evidence of focal disc prolapse." Tr. 982. There was also "neural foraminal narrowing at C5-C6 and C6-C7." Tr. 982. It was explained to Plaintiff that these findings were "not severe enough to warrant [a n]eurosurgical consultation." Tr. 982.

At the end of October, Plaintiff reported "noticing small improvement" and had been sleeping better the last few days. Tr. 980; *see also* Tr. 977. Her physical therapist noted that she was "[m]oving better today" and "showing increased repetitions on lumbar and cervical extension" as well as "increased weight tolerance." Tr. 980; *see also* Tr. 977.

Into the first part of November, Plaintiff was "feel[ing] more hopeful, optimistic and able to complete activities despite having [ongoing] pain." Tr. 974. Although she continued to experience pain, the pain in her right elbow had decreased. Tr. 974; *see also* Tr. 973. Plaintiff was also "participating more in leisure and hobby activities for herself." Tr. 974. She "notice[d] that she has improved strength" and "is able to lift feed bags without too much difficulty." Tr. 973. Plaintiff was subsequently discharged from the pain management program. *See* Tr. 971-73. Plaintiff reported gains in strength and endurance and her "right forearm and wrist pain [we]re essentially gone." Tr. 972.

Less than one week later, Plaintiff fell down five icy concrete steps and hit her head. Tr. 970-71; *see* Tr. 747-52. Plaintiff went to the emergency room with complaints of "neck pain and upper back intrascapular pain." Tr. 748. Plaintiff "denie[d] any weakness or numbness in the hands or upper limbs." Tr. 748. Plaintiff exhibited

22

tenderness upon examination.  Tr. 750.  A CT scan of Plaintiff's cervical and thoracis spine was "negative for any fracture or acute changes."  Tr. 750.  Plaintiff received two Toradol injections[2] and was discharged with Flexeril[3] to use as needed for pain and advised to follow up with her primary care provider.  Tr. 750, 752.

Notes indicate that Plaintiff "and her significant other became very rude and belligerent when results were given and told that she had been discharged home."  Tr. 750; *see also* Tr. 752.  Plaintiff's significant other stated that "someone is going to have to help her dress."  Tr. 752.  When nursing assistance was offered to Plaintiff, she indicated that she could do it herself and "put on her jeans, bra, t-shirt, jacket and slippers by herself without any observed difficulty in movements."  Tr. 752.  Plaintiff rested briefly against the bed rail once dressed.  Tr. 752.  Plaintiff refused to sign the discharge papers, stating that she did not agree with them.  Tr. 752.  Plaintiff subsequently called wanting to see Dr. Durie afterwards.  Tr. 970-71.  Plaintiff commented that she "fe[lt] she is right where she was in the beginning" before the pain program.  Tr. 970.

During a follow-up rheumatology appointment in early December, it was noted that Plaintiff was "tearful" because of chronic pain, including "[a] lot of stiffness, back pain, extremity pain, [and] neuropathy affecting [her] right hand."  Tr. 961.  Treatment notes continued to reflect full muscle strength and "[g]ood muscle tone without atrophy."  Tr. 962.  They similarly noted largely normal findings related to Plaintiff's shoulders,

---

[2] Toradol is a brand name for ketorolac, a medication "used to relieve moderately severe pain." *Ketorolac Injection*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a614011 html (last accessed Mar. 30, 2022).

[3] Flexeril is a brand name for cyclobenzaprine, a medication "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Mar. 30, 2022).

elbows, wrists, and hands, other than the mild degenerative changes and node enlargements. Tr. 962.

In mid-December, Plaintiff fell down some wooden steps and went to the emergency room. Tr. 742. Notes from the encounter indicate that Plaintiff "need[ed] direction to stay on task on what injuries and pain is new today from the fall." Tr. 742. Both Plaintiff and her significant other "verbalized frustration with her pain over the last 2 years and fe[lt] they have 'gotten the run around.'" Tr. 742. "After a conversation at length it [wa]s determined that [Plaintiff] ha[d] increased pain in her neck, left side of ribs, left elbow, lumbar back, right hip and pelvis." Tr. 742; *see id.* ("She has difficulty staying on topic as she wants to discuss all her health ailments.").

When the treatment provider entered the exam room, Plaintiff was "talking on her cell phone with her left arm bent." Tr. 744. "After she [wa]s off the phone[,] she [wa]s texting with both hands and moving her arms freely." Tr. 744. While Plaintiff had some tenderness and swelling, she had normal range of motion, reflexes, muscle tone, and coordination. Tr. 744. Imaging showed no broken ribs; some degenerative changes in Plaintiff's cervical spine consistent with imaging in November 2017; soft tissue swelling in her elbow; and degenerative changes as well as pelvic calcification and spine straightening in her lumbar spine. Tr. 746. Plaintiff was noted to be "VERY frustrated with [the] plan of care." Tr. 746. She and her significant other were upset when told that narcotic medication would not be prescribed. Tr. 474.

The next day Plaintiff saw Dr. Durie. Tr. 956. She told him about the fall and was again "very frustrated, having been dealing with this pain for two years now." Tr. 956;

*see also* Tr. 959.  Plaintiff also reported that she "found a positional component to her hand symptoms": "When she looks down[,] her fingers of the right hand (thumb and first two fingers) will go numb.  When she picks her head up[,] it improves.  If she picks her chin up to look up[,] the fingers will tingle again."  Tr. 957.  Dr. Durie prescribed a lidocaine patch or gel for her neck and back and suggested Plaintiff "look into seeing if she can get a massage from a therapist who does myofascial work."  Tr. 959.

### c.  2018

Around the middle of March 2018, Plaintiff was seen in pain management for, among other things, follow-up after her recent falls and aggravation of her "upper back interscapular pain [and] shoulder pain."  Tr. 948.  Notes from the examination included:

> Examination of cervical spine – Spurling's negative on right side.  Examination of shoulder region – right Hawkins and Neer tests positive.  Left side negative.  Myofascial trigger points identified in bilateral upper trapezius interscapular muscles.  Bilateral carpal tunnel signs positive.  Upper extremities – no focal motor deficit.  Some subjective weakness in left hand grip noted and maybe subtle weakness but otherwise no gross weakness appreciated and that subtle weakness arising again because of poor effort.

Tr. 948.  In relevant part, Plaintiff was diagnosed with right shoulder pain secondary to right rotator cuff tendinitis; bilateral hand symptoms, "most likely carpal tunnel syndrome"; and upper back interscapular pain, "myofascial in nature, with trigger points."  Tr. 948.  Plaintiff was prescribed physical and occupational therapy as well as a TENS unit.  Tr. 948; *see* Tr. 949.

Plaintiff began another course of physical therapy soon thereafter.  *See, e.g.*, Tr. 927-28, 931-33, 935-36, 940-47, 1265, 1260.  Plaintiff continued to be independent with

her activities of daily living and raised rabbits, chickens, and turkeys.  Tr. 946.  Plaintiff reported that "her right shoulder has been painful for some time," stating "[i]t 'clunks and grinds' and she has difficulty lifting, carrying and reaching overheard."   Tr. 946. Plaintiff's neck "fe[lt] stiff and painful" and flexing forward caused numbness in her right first three fingers.  Tr. 946.  "[E]xtension cause[d] pain and numbness as well."  Tr. 946.  Plaintiff's right shoulder hurt more than her left shoulder.  Tr. 946.  Examination results showed greater grip strength in Plaintiff's right hand compared to her left with slightly greater range of motion in her left shoulder compared to the right.   Tr. 946. Plaintiff's upper extremity strength was between 4 and 5/5 on both the left and right.  Tr. 946.

As her sessions progressed, Plaintiff reported some improvement in her pain and movement.  Tr. 941, 943, 935, 932, 1260.  On one occasion, she reported that "[s]he was able to do some cleaning over the weekend."  Tr. 941.  At another session in mid-April, Plaintiff reported that "[s]he cleaned out her chicken coop yesterday which involved using the pitch fork."  Tr. 935.  "She was also able to help her neighbor with laundry," "go[ing] at her own pace and . . . us[ing] good body mechanics."  Tr. 935.  While "[s]ome days [we]re worse than others[,] . . . [Plaintiff] report[ed] general improvement with therapy."  Tr. 1260.

During a rheumatology follow-up in early May, it was noted that Plaintiff did "not have extension deficits or contractures" in her elbows.  Tr. 1264.  Plaintiff's wrists had normal range of motion.   Tr. 1264.   The mild degenerative changes and node enlargements in her hands were noted, and there was no synovitis.  Tr. 1264.  Similar

findings were made when Plaintiff was seen at the end of July, and it was noted that Plaintiff's shoulders had normal range of motion. *Compare* Tr. 1330, 1393 *with* Tr. 1264.

In early July, approximately one week before a pain management appointment, Plaintiff called the clinic to report that the "pain in her neck, low back and pelvic area are at a 10/10." Tr. 1397. Plaintiff "was crying and upset on the phone as she stated many times she is just frustrated as her pain is so bad." Tr. 1397. Plaintiff "even called the suicide hotline last night so she could talk to someone about her pain." Tr. 1397; *see also* Tr. 1391. When it was suggested that Plaintiff go to the emergency room, she stated "she can't do that because she has responsibilit[ies] at home" and "[t]he emergency room does not do anything anyway." Tr. 1397. Plaintiff later stated she would "think about going" to the emergency room. Tr. 1397.

At the pain management appointment, Plaintiff reported that her pain was "affecting her quality of life again at this time." Tr. 1395. Among other things, positive fibromyalgia tender points were noted. Tr. 1395. Plaintiff was diagnosed with fibromyalgia and prescribed Lyrica.[4] Tr. 1395.

At the end of August, Plaintiff had a cervical epidural steroid injection to address her "right-sided neck and arm pain." Tr. 1376; *see* Tr. 1377. Upon examination, "Spurling's trigger[ed] some tingling into the forearm. Forward flexion of the neck trigger[ed] some numbness in a median distribution in the right hand as well." Tr. 1377.

---

[4] Lyrica is a brand name for pregabalin, a medication used to treat neuropathic pain. *Pregabalin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a605045.html (last accessed Mar. 30, 2022).

There were no "gross motor deficits in either upper limb." Tr. 1377. Plaintiff did "have decreased sensation in the tips of the median 4 digits in the right hand." Tr. 1377. During an appointment with Dr. Durie in early October, Plaintiff reported she had not yet experienced any relief. Tr. 1369.

In early December, Plaintiff went to the emergency room after she cut her left middle finger while "butchering rabbits." Tr. 1570. Plaintiff was noted to have full range of motion. Tr. 1573-74. "Extension and flexion [were] intact to all digits on [her] left hand." Tr. 1574.

At the end of December, Samuel C. Hoxie, MD, performed an "endoscopic carpal tunnel release" on Plaintiff's right hand. Tr. 1514.

### d. 2019

At a pain management appointment in early May 2019 with a new provider, Plaintiff reported that she "[g]ets grinding in the neck – sounds like gravel at times." Tr. 1470. She also "[h]as a catch in the neck when she turns to the right, sometimes will snap." Tr. 1470. Plaintiff further reported that "[i]f she tips her head to the right side – she gets tingling into the right arm and down to the thumb." Tr. 1470. Plaintiff's arm would feel like it "is asleep" and "this will go away with time." Tr. 1470. Plaintiff's left wrist also bothered her, including ulnar neuropathy and a loss of "intrinsic hand strength." Tr. 1471. Plaintiff's elbows were not an issue. Tr. 1471. Plaintiff reported that she "[h]as trouble with any activities." Tr. 1470; *see also* Tr. 1476 ("She is significantly functionally limited, although tries to remain as active as possible."). Findings included "right C6 radiculopathy with associated reflex change, strength is

intact." Tr. 1476. It was "[h]ighly recommended [that Plaintiff] incorporat[e] a low impact aerobic exercise program into her daily routine." Tr. 1477.

When Plaintiff was admitted to the hospital later that month following a threatened suicide attempt, *see infra* Section V.C.1.e, her neck was noted to be supple and full and she had painless range of motion. Tr. 1627, 1648. Plaintiff's extremities also had full and painless range of motion. Tr. 1627, 1648.

During a consultation for numerous health issues with a new provider in early June, Plaintiff reported that she has "few and infrequent good days." Tr. 1496; *see also* Tr. 1496-97. She reported difficulty typing responses to questions due nerve damage and numbness in her hands and fingers. Tr. 1496. Plaintiff reported that her "[p]elvis hurts after shoveling while working with her rabbits and chickens." Tr. 1496. Plaintiff also had "to pace herself to remain active." Tr. 1496. Plaintiff enjoyed cooking but found it "challenging due to injuries with [her] hands." Tr. 1497. Plaintiff was "[s]till having pain in her hand with extension and then pushing off with it." Tr. 1497. Plaintiff also had "numbness in [her right] arm" when her neck was "positioned forward then extension." Tr. 1497. Plaintiff reported stress as a result of not being able to work in her field. Tr. 1497. Plaintiff described her household as consisting of her significant other, four dogs, a rabbit, and a cat. Tr. 1499.

Plaintiff was "working on disability to help with independence," stating that her goal was "at some point to be on her own but needs financial stability first." Tr. 1497. Plaintiff's significant other "pays the bills[ and] she takes care of him." Tr. 1497.

Plaintiff's treatment provider noted that her "situation is no doubt, very challenging" with "a multitude of complex symptomology." Tr. 1508. Plaintiff "[w]ould likely benefit from comprehensive lifestyle modifications," and a conversation was started "regarding finding ways to deal with acute stress including finding a place at home that is just hers that she can keep organized, spending time outside with bare feet, short guided meditations, tai chi or chair yoga, [and] acupuncture." Tr. 1508. It was further noted that it would likely "be challenging to get [Plaintiff's] symptoms under good control without improving home and financial stress." Tr. 1509.

Plaintiff returned to Dr. Hoxie in mid-June to follow up regarding her right wrist pain. Tr. 1514. Plaintiff indicated the pain was on her inner wrist and "there [wa]s a palpable bump at this area." Tr. 1514. Plaintiff "denie[d] paresthesia." Tr. 1514. Plaintiff's pain was "exacerbated by cutting with a knife or shutting a tail gate." Tr. 1514. Plaintiff had normal sensation in all of her fingers and full finger range of motion. Tr. 1514. She was "[m]ost tender right along the ulnar pillar." Tr. 1514. Dr. Hoxie additionally observed that Plaintiff would "get radiculopathy along the radial forearm in the dorsum of her thumb" when her neck was in certain positions. Tr. 1514.

At a pain management appointment in mid-August, Plaintiff wanted to focus on her neck pain. Tr. 1547. Plaintiff's neck pain had "been significantly worsening over the years." Tr. 1547. Plaintiff reported that she is unable to "reach her arm out and if she tilts her head a certain way she will get a numby [sic] feeling down the right arm." Tr. 1547; *see* Tr. 285. Plaintiff's back was tender to palpation and her neck range of motion was "mildly reduced in rotation bilaterally." Tr. 1549. Plaintiff had full strength in her

30

upper extremities.   Tr. 1549.   An "aquatic-based exercise program for aerobic conditioning and general restrengthening with low impact and risk for injury was recommended" and an MRI of Plaintiff's cervical spine was ordered.  Tr. 1549.  The MRI showed "narrowing of the nerves on the right side of the spine at the C5-C6 and C6-7 levels" and Plaintiff was instructed to let the clinic know if she would like a referral for an epidural steroid injection in her neck.  Tr. 1566; *see* Tr. 334.

Plaintiff had the epidural steroid injection in her neck at the beginning of November.  Tr. 277-86.  At her next pain management appointment approximately two weeks later, Plaintiff reported that the "neck injection was not particularly helpful for her symptoms."  Tr. 257.  Plaintiff continued to report "difficulties with any activities that require forward flexed positioning of her head and neck or repetitive movements of her upper extremities as this resulted in increased neck pain and upper extremity numbness." Tr. 257.  "Numbness remain[ed] in a C6 distribution on the right."  Tr. 257.  Plaintiff was "increasingly frustrated with her functional limitations and persistent pain syndrome." Tr. 257.  Plaintiff was referred for a neurosurgical consultation and to an additional pain management program.   Tr. 260.   Plaintiff was also advised to continue with a "home exercise program for core strengthening and general conditioning."  Tr. 260.

### e.  2020

In early February 2020, Plaintiff sent Dr. Hoxie a message regarding concerns over "ongoing difficulty with bilateral hand pain" and being "labeled with poor effort and perhaps 'faking' or 'Munchausen.'"  Tr. 148.  Plaintiff requested "written documentation of ongoing difficulty with nerve problems in both upper extremities and concern for

atrophy of muscles in her hands." Tr. 148. Dr. Hoxie "had a lengthy discussion with [Plaintiff]." Tr. 148. Dr. Hoxie advised that "[i]f [Plaintiff] is having these ongoing difficulties[,] . . . the most reasonable next step would be electrodiagnostic studies of both upper extremities." Tr. 148. Dr. Hoxie noted an upcoming appointment with neurosurgery and directed Plaintiff to obtain the studies, stating he could coordinate with neurosurgery depending on the results. Tr. 148; *see* Tr. 139, 143, 82-91.

The results of Plaintiff's EMG study were discussed at her neurosurgery consultation in early March. Tr. 61. While Plaintiff's EMG "showed no evidence at this time of a cervical radiculopathy on the right," it was also noted that "a negative EMG does not exclude the possibility of radiculopathy" with a "[f]alse negative rate . . . [of] 40%." Tr. 61. Plaintiff reported constant neck pain "at a 5/10" as well as migrating pain when her head was in a flexed position and "tingling sensations that progress[] to shooting lighting pain down a C5, C6, C7 distribution and [the first] and [second] digit." Tr. 61. Plaintiff was "[v]ery frustrated because she believes that other providers think that she is lying about her pain complaints." Tr. 61. Plaintiff was noted to have full strength in her upper extremities. Tr. 69. It was recommended that Plaintiff not pursue surgery at this time and try a course of physical therapy. Tr. 70.

### 2.  Opinion Evidence

#### a.  Dr. Hoxie

In June 2019, Dr. Hoxie completed a hand/upper extremity medical source statement. *See generally* Tr. 1452-58. Dr. Hoxie indicated that he had treated Plaintiff for left ulnar neuropathy and that her condition was not likely to improve. Tr. 1452.

Dr. Hoxie indicated that Plaintiff's left extremity was the more severely impaired and identified the following findings as being present in Plaintiff's left hand: muscle weakness, atrophy, sensory loss, reflex changes, reduced grip strength, disorganization of motor function, disturbance of gross movements, and disturbance of dexterous movements. Tr. 1452-53. No findings were indicated for Plaintiff's right hand. Tr. 1452.

Dr. Hoxie opined that Plaintiff's pain and other symptoms were severe enough to "frequently (up to 75% of the day)" interfere with attention and concentration. Tr. 1454. Dr. Hoxie additionally opined that Plaintiff's symptoms would interfere such that she was "unable to maintain persistence and pace to engage in competitive employment." Tr. 1454. Dr. Hoxie further opined that Plaintiff was not capable of part-time work either. Tr. 1454.

When asked the degree to which Plaintiff's symptoms interfere with her ability to perform activities of daily living, Dr. Hoxie opined there was moderate interference. Tr. 1455. Dr. Hoxie indicated the following activities would likely be difficult for Plaintiff to perform: picking up coins, carrying objects, opening a jar, working with tools, using a computer, keyboarding, cutting/preparing food, and lifting and carrying a gallon of milk. Tr. 1455.

Dr. Hoxie checked "none" when asked to opine on the number of days per month Plaintiff was likely to be absent related to her symptoms. Tr. 1455. He likewise answered "no" when asked if Plaintiff was likely to suffer fatigue as a result of her

conditions, but then checked "moderate" when asked to what degree any such fatigue would impair Plaintiff's ability to work. Tr. 1455.

Dr. Hoxie opined that Plaintiff could occasionally lift less than 10 pounds and never 10 pounds or more. Tr. 1456. With respect to Plaintiff's right hand, she could occasionally perform firm grasping and fine finger dexterity activities. Tr. 1456. In contrast, Plaintiff could never do these activities with her left hand. Tr. 1456. Additionally, in relevant part, Plaintiff could never reach, pull, push, perform overhead work, pound, and perform power gripping. Tr. 1456. Dr. Hoxie further opined that Plaintiff could not perform repetitive tasks with her upper extremities and did not have good use of her hands for manual dexterity activities and repetitive hand-finger actions. Tr. 1456-57. At the same time, when asked if Plaintiff had "a significant limitation of [her] ability to manipulate, handle, and work with small objects with both hands," Dr. Hoxie checked "no." Tr. 1457.

Dr. Hoxie opined that Plaintiff was able to spend one hour using a computer or typing in an eight-hour day. Tr. 1457. Plaintiff was able to use her left hand to lift and carry objects, but only rarely. Tr. 1457. Plaintiff was not able to use her left hand to perform dexterous movements. Tr. 1457.

### b. State Agency Medical Consultants

The state agency medical consultants assessed Plaintiff's functional limitations with respect to the use of her upper extremities similarly at both the initial and reconsideration levels. *Compare* Tr. 421-22, 436-37 *with* Tr. 451-53, 464-66. They opined that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and

carry 10 pounds.  Tr. 421, 436, 451-52, 464-65.  They also opined that Plaintiff was limited to occasional use of her right upper extremity for reaching "in front and/or laterally," handling, and fingering based on her carpal and cubital tunnel syndromes.  Tr. 422, 437-38, 452-53, 465-66.

### 3.  Persuasiveness of the Opinion Evidence

As Plaintiff's applications were filed after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c and 416.920c apply to the evaluation of medical opinions and prior administrative medical findings.  *See generally* 20 C.F.R. §§ 404.1520c, 416.920c.  Under these regulations, no deference or "specific evidentiary weight, including controlling weight," is given "to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical source."  20 C.F.R. § 404.1520c(a); *accord* 20 C.F.R. § 416.920c(a).  Rather, the "persuasiveness" of a particular medical opinion is determined based on consideration of five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) examining relationship, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

The first two factors, supportability and consistency, "are the most important factors" when determining the persuasiveness of a medical opinion.  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2); *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20

C.F.R. § 404.1520c(c)(1); *accord* 20 C.F.R. § 416.920c(c)(1).  Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2); *accord* 20 C.F.R. § 416.920c(c)(2).  Under the regulations, an ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions" in the decision.  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).  An ALJ "may, but [is] not required to, explain how [he or she] considered the [remaining] factors."  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).

### a.  Dr. Hoxie

The ALJ found Dr. Hoxie's opinion to be unpersuasive for three reasons.  First, the ALJ found Dr. Hoxie's opinion that Plaintiff met Listing 1.02.B., which requires "[i]nvolvement of one major peripheral joint in *each* upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in an inability to perform fine and gross movements effectively," 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.B (emphasis added), was not consistent with evidence in the record that Plaintiff "does not have an inability to perform fine and gross movements as required by the listing because although Plaintiff "has had weakness, her grip and pincer strength have been noted as good or normal."  Tr. 14.  Second, the ALJ found Dr. Hoxie's opinion that Plaintiff's pain and other symptoms were severe enough to frequently interfere with attention and concentration was inconsistent with evidence in the record that Plaintiff "consistently had unremarkable

attention and concentration." Tr. 20. Third, "[g]iven notations of normal or mildly reduced grip strength in the record," the ALJ found that "Dr. Hoxie's opinion that [Plaintiff] can never grasp firmly" to be "yet another stark inconsistency." Tr. 20. The ALJ concluded that "[t]he litany of stark inconsistencies between Dr. Hoxie's opinion and the record, of which the three aforementioned instances are representative, indicate that the doctor's opinion lacks probative value in general." Tr. 20.

Plaintiff asserts that the ALJ's criticism with respect to Listing 1.02.B "is not entirely accurate" as the listing "requires the involvement of one major peripheral joint in *each* upper extremity, however, Dr. Hoxie's opinion only referred to 'one major peripheral joint in the upper extremity.'" Pl.'s Mem. in Supp. at 16 (quoting Tr. 1453). True, Listing 1.02.B requires the involvement of a major peripheral joint in both upper extremities. The ALJ's criticism, however, was not that Dr. Hoxie opined that a major peripheral joint in only one of Plaintiff's upper extremities was involved and Listing 1.02.B requires two,[5] but that the evidence in the record did not support and was not consistent Dr. Hoxie's substantive conclusion that there was an inability to perform fine and gross dexterous movements effectively.

The "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00.2.c. "[E]xamples of inability to

---

[5] Dr. Hoxie checked a descriptive paragraph on the form that referenced Listing 1.02.B, but was expressly limited to "[m]ajor dysfunction of one major peripheral joint in *the* upper extremity . . . ," rather than *each* upper extremity. Tr. 1453 (emphasis added). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.B.

perform fine and gross movements effectively include, but are not limited to, the inability to prepare simple meals and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id.* The ALJ noted significant evidence to the contrary of such an extreme loss of function and reflective of greater functionality in Plaintiff's upper extremities than alleged based on evidence in the record showing that Plaintiff took care of her significant other notwithstanding her testimony at the hearing, Tr. 17-18; *compare* Tr. 1497 *with* Tr. 384; cared for her chickens, including cleaning their coop with a pitchfork and gathering eggs, Tr. 17-18; *see, e.g.*, Tr. 1062, 1038, 1026, 753, 973, 946, 953, 1496, 1338, 302; and butchered rabbits, Tr. 18; *see* Tr. 1570; *see also, e.g.*, Tr. 1062, 1038, 946, 1496, 302 (caring for rabbits). The ALJ also noted that Plaintiff was observed to have no difficulty using her upper extremities to do things such as dress herself and text on her phone with both hands. Tr. 17; *see* Tr. 752, 744. The ALJ did not err by concluding that Dr. Hoxie's opinion that Plaintiff had such an extreme loss of function was inconsistent with other evidence in the record and using this inconsistency as one consideration in determining the persuasiveness of Dr. Hoxie's opinion. *See* 20 C.F.R. §§ 404.1520c(a), (b)(2), (c)(2), 416.920c(a), (b)(2), (c)(2).

Plaintiff additionally asserts the ALJ's conclusion "that Dr. Hoxie's opinion is inconsistent with 'notation of normal or only mildly reduced grip strength'" is the result of focusing only on benign findings in the wake of contrary evidence in the record. Pl.'s Mem. in Supp. at 16 (quoting Tr. 20). Similarly, Plaintiff asserts that "while Plaintiff's grip, during a brief test on two occasions, may seem normal, that does not indicate that

she can then handle and finger for up to two[-]thirds of the workday with her right hand and finger and handle for up to a third of the work[day] with her left" as required by the ALJ's residual-functional-capacity determination.  Pl.'s Mem. in Supp. at 17.

Plaintiff points to evidence in the record that it was noted that she had "severe intrinsic muscle atrophy with finger abduction weakness" and grip weakness in her left hand.  Pl.'s Mem. in Supp. at 17 (citing Tr. 707, 1072).  Plaintiff also points to a notation that she "had a compensatory strategy related to increased wrist extension on the left side and abnormal movement of the left thumb in certain positions with flexion and extension of the wrist related to reattachment of the tendon."  Pl.'s Mem. in Supp. at 17 (citing Tr. 1062).  Plaintiff likewise points to comparative grip, pinch, and grasp strength findings between her left and right upper extremities with decreased performance on the left.  Pl.'s Mem. in Supp. at 17 (citing Tr. 1062, 1047, 1039).

Notably, the ALJ expressly discussed the severe intrinsic muscle atrophy with finger abduction weakness and abnormalities in Plaintiff's left hand which ultimately required surgery in 2017 and that, after surgery, Plaintiff continued to experience hypersensitivity and grip weakness on the left.  Tr. 16-17.  The ALJ concluded that this medical evidence—"muscle atrophy, finger abduction weakness, ongoing degenerative changes, and grip weakness, some of which persist after her surgery"—warranted a limitation that Plaintiff could only "occasionally finger and handle with [her] left hand."  Tr. 17.  Thus, the ALJ concluded Plaintiff was in fact more limited in the use of her left upper extremity than the state agency medical consultants, who identified limitations only

with respect to Plaintiff's right upper extremity. Likewise, the ALJ acknowledged the carpal and cubital tunnel syndrome in Plaintiff's right hand.

At the same time, the ALJ pointed to numerous places in the record "suggest[ing] that [Plaintiff] retains more functional ability than alleged." Tr. 17. The ALJ pointed to records throughout the period in question showing, for example, full strength in Plaintiff's upper extremities; full range of motion in her hands, elbows, and wrists; normal or mildly reduced grip strength depending on whether it was Plaintiff's right or left hand; intact sensation; mild joint enlargements in her hands; and mild degenerative changes in her hands. Tr. 17-18; *see also* Tr. 18 ("Unremarkable strength, normal range of motion, intact grip, intact sensation, and other unremarkable findings suggest that [Plaintiff] retains more functional ability that alleged."), ("Such ongoing normal or minimally abnormal findings suggest that [Plaintiff's] symptoms are not as intense, persistent, and limiting as alleged."). Further, the ALJ found significant that Plaintiff "reported that her right forearm and wrist pain were essentially gone with pain rehabilitation." Tr. 18.

Plaintiff is essentially asserting that the ALJ cherry-picked the evidence to support his conclusion. The administrative record in this case totaled close to 1,800 pages, over 1,400 of which were medical records. It is not surprising that Plaintiff is able to point to some evidence the record that could support a finding of greater limitation in the use of her upper extremities. *See, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[I]t is not surprising that, in an administrative record which exceeds 1,500 pages, Fentress can point to some evidence which detracts from the Commissioner's

40

determination.").   The Court appreciates that Plaintiff "has a fundamentally different view of the evidence than the ALJ." *Rhinehart v. Saul*, 776 F. App'x 915, 916 (8th Cir. 2019) (per curiam).  The role of this Court, however, "is not to reweigh the evidence, but to ensure that the [ALJ's] decision is supported by substantial evidence in the record." *Johnson v. Astrue*, 627 F.3d 316, 319 (8th Cir. 2010); *see Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) ("It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."); *see also Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) (same).  There is substantial evidence in the record as a whole to support the ALJ's conclusion that Plaintiff generally had "normal or mildly reduced grip strength."  Tr. 20.  Accordingly, the ALJ did not err by using the inconsistency between the objective medical evidence in the record regarding Plaintiff's grip strength and Dr. Hoxie's opinion that Plaintiff could never grasp firmly with her left hand as an additional consideration in determining the persuasiveness of Dr. Hoxie's opinion.  *See* 20 C.F.R. §§ 404.1520c(a), (b)(2), (c)(2), 416.920c(a), (b)(2), (c)(2).

Lastly, Plaintiff takes issue with ALJ's criticism of Dr. Hoxie's opinion that her pain and symptoms would frequently interfere with her attention and concentration. Plaintiff asserts the ALJ's conclusion that the record showed she consistently had unremarkable attention and concentration "does not have any application to Dr. Hoxie's findings regarding handling, fingering, and reaching," and, in any event, "the assertion is not an entirely accurate representation of the record."  Pl's Mem. in Supp. at 18.

As stated above, consistency with other evidence in the record is one of the most important factors in determining the persuasiveness of a particular opinion.  20 C.F.R.

§§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).  At the same time, if Dr. Hoxie's opinion on the extent to which Plaintiff's pain and other symptoms would interfere with her abilities to pay attention and concentrate were the only basis upon which the ALJ found the handling and fingering limitations Dr. Hoxie identified to be unpersuasive, the Court would have considerable pause.  Here, however, this was just one "representative" inconsistency of a "litany of stark inconsistencies between Dr. Hoxie's opinion and the record" determined by the ALJ.[6]  Tr. 20,

Furthermore, the ALJ's observation that Plaintiff "consistently had unremarkable attention and concentration" is supported by substantial evidence in the record as a whole.  Plaintiff points to instances in the record in which her providers reported that she was fixated on her physical complaints; had rambling speech; was eager for medical care and attention; and appeared anxious, agitated, or emotional.  Pl.'s Mem. in Supp. at 18-19 (citing Tr. 811, 787, 767, 761, 758, 710, 1004, 742, 946, 1293).  Plaintiff also points to her presentation at the emergency room at the end of May 2019.  Pl.'s Mem. in Supp. at 19 (citing Tr. 1627-28, 1703-04).  Yet, mental status examinations routinely reflected that Plaintiff had normal attention and concentration.  *See, e.g.*, Tr. 826, 813, 790.  Although there were times in which Plaintiff appeared anxious, agitated, or emotional, Plaintiff was

---

[6] To the extent the Commissioner has identified additional inconsistencies between Dr. Hoxie's opinion and the record other than the three identified by the ALJ, *see* Comm'r's' Mem. in Supp. at 17-18, ECF No. 26, the Court has not considered them.  *See, e.g., Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("It is not the role of the courts to speculate on reasons that might have supported an agency's decision.  We may not supply a reasoned basis for the agency's action that the agency itself has not given." (quotation omitted)); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992) ("We recognize the well-established rule that an agency's action may not be upheld on grounds other than those relied on by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943))); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 n.7 (8th Cir. 1979) ("It is well established that an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of appellate counsel.").

regularly noted to have "no obvious problems with attention[ and] concentration" even when she was fixated on her physical complaints. *Compare* Tr. 811 *with* Tr. 813; Tr. 787 *with* Tr. 790; Tr. 767 *with* Tr. 769.

In sum, the Court concludes that the reasons given by the ALJ for finding Dr. Hoxie's opinion to be unpersuasive reflect a thorough consideration of the consistency of his opinion with the other evidence in the record as required by 20 C.F.R. § 404.1520c and § 416.920c and are supported by substantial evidence in the record as a whole.

### b. State Agency Medical Consultants

Turning next to the state agency medical consultants, the ALJ found their prior administrative medical findings to be partially persuasive. The ALJ found their conclusion that Plaintiff "is limited to light exertion . . . [to be] consistent with and supported by evidence of pain, abnormal imaging, and [the] reasonableness of [Plaintiff's] allegations to an extent," and thus persuasive. Tr. 19.

Conversely, the ALJ found, in relevant part, that Plaintiff's "normal shoulder range of motion and notations that she overstates the extent of her symptoms [to] undermine the consultants' findings that [Plaintiff] is limited in reaching." Tr. 19. The ALJ additionally found that "[t]he evidence . . . indicates that [Plaintiff] actually retains the ability to frequently rather than occasionally handle and finger on the right . . . based on clinical findings of only minimal swelling, lack of noted severe intrinsic muscle atrophy on the right (as opposed to the left), and reported significant improvement of right wrist pain with rehabilitation." Tr. 19. At the same time, the ALJ found that Plaintiff was more limited than the state agency medical consultants in the sense that "the

evidence indicate[d] that [Plaintiff] has restrictions in handling and fingering on the left as well as the right, given the required surgery and abnormal findings in both hands."  Tr. 19.  Accordingly, the ALJ concluded that "the consultants' findings regarding non-exertional restrictions are inconsistent and unsupported, rending those portions of their findings unpersuasive."  Tr. 19.

Plaintiff asserts that the ALJ impermissibly "play[ed] doctor" when considering the consistency of the state agency consultants' prior administrative medical findings with the other medical evidence in the record.  Pl.'s Mem. in Supp. at 19.  *See, e.g.*, *Adamczyk v. Saul*, 817 F. App'x 287, 289 (8th Cir. 2020) (per curiam) ("[T]he ALJ cannot 'play doctor,' meaning that the ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own."); *see also Combs*, 878 F.3d at 646, 647.  Plaintiff asserts that the purported inconsistencies in the record identified by the ALJ were for conditions other than the carpal and cubital tunnel syndromes in her right hand to which the state agency medical consultants attributed the reaching, handling, and fingering limitations.  Plaintiff additionally asserts that "one hand being worse does not then indicate that the less severe extremity does not require limitations to occasional handling and fingering" and she continued to experience pain in her wrist even after surgery.  Pl.'s Mem. in Supp. at 20.  Plaintiff also takes issue with the ALJ's reliance on notations that "she overstates the extent of her symptoms [to] undermine" the reaching limitation, asserting that because the state agency medical consultants "have never met [her,] . . . they have no reason to be unduly swayed by subjective complaints."  Pl.'s

Mem. in Supp. at 21.  Plaintiff then recounts all of the medical evidence in the record she believes supports the limitations identified by the state agency medical consultants.

Again, "the mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *accord Perks*, 687 F.3d at 1091.  Similarly, a claimant's contention that the ALJ should have weighed the evidence "differently or drawn different conclusions do[es] not warrant relief under [this] deferential standard of review."  *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016); *see Rhinehart*, 776 F. App'x at 916.

Nevertheless, "an ALJ must not substitute his opinions for those of the physician." *Combs*, 878 F.3d at 647; *see Adamcyzk*, 817 F. App'x at 289.  "The ALJ may not simply draw his [or her] own inferences about [the claimant's] functional ability from medical reports."  *Combs*, 878 F.3d at 646 (quotation omitted); *accord Koch v. Kijakazi*, 4 F.4th 656, 667 (8th Cir. 2021).  In *Combs*, the state agency medical consultants disagreed as to the claimant's lifting abilities.  878 F.3d at 645-46.  One of them opined that the claimant "was able to lift ten pounds occasionally and less than ten pounds frequently and was therefore limited to sedentary work."  *Id.* at 645.  The other opined that the claimant was "capable of work at the light exertional level and could lift twenty pounds occasionally and ten pounds frequently."  *Id.*  The ALJ gave greater weight to the less restrictive opinion, finding it to be "more consistent with the record as a whole, and with the notations in the treatment notes specifically."  *Id.*  In particular, the ALJ cited to the

claimant's "treating physicians' notations of 'no acute distress' and 'normal movements.'" *Id.* at 646.

On appeal, the Commissioner conceded that "no acute distress" was not particularly significant to the claimant's arthritis but maintained that "the finding of 'normal movement of all extremities' is inconsistent with [the claimant's] complaints of pain." *Id.* at 647. The Eighth Circuit Court of Appeals "conclude[d] the ALJ erred in relying on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement of all extremities' when determining the relative weight to assign to [the two opinions]." *Id.* The appellate court reasoned that "the relevance of this finding in terms of [the claimant's] ability to function in the workplace [wa]s not clear" and the ALJ improperly "rel[ied] on his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of" the claimant's residual functional capacity. *Id.* The matter was remanded for further inquiry as to what relevance these notations had "for [the claimant's] ability to function in the workplace." *Id.*

The Court concludes that the ALJ erred by making similar inferences regarding the significance certain notations in the record had to Plaintiff's ability to function in the workplace when evaluating the persuasiveness of the state agency medical consultants' prior administrative medical findings regarding her abilities to handle and finger with her right hand. The state agency medical consultants opined that Plaintiff could only occasionally finger and handle with her right hand due to carpal and cubital tunnel syndromes. The ALJ found this to be unpersuasive based on "clinical findings of only

46

minimal swelling, lack of noted severe atrophy on the right . . . , and reported significant improvement of wrist pain with rehabilitation" and concluded that Plaintiff could frequently handle and finger with her right hand  Tr. 19.  Like *Combs*, it is not clear what relevance these findings have to the *degree* of functional impairment Plaintiff has in her right hand without exercising medical judgment.  *See* 878 F.3d at 647; *see also Jennifer A. Berryhill*, No. 18-cv-459 (BRT), 2019 WL 569830, at *11 (D. Minn. Feb. 12, 2019) ("There was no way for the ALJ to know whether 'normal movement' and 'no acute distress' was more consistent with a ten-pound weight restriction than a twenty-pound weight restriction based on those notes without exercising medical judgment." (citing *Combs*, 878 F.3d at 647)).  As such, the ALJ erred in his evaluation of state agency medical consultants' prior administrative medical findings by relying on his own inferences from notations in the medical evidence to conclude that Plaintiff could perform handling and finger activities with her right hand on a frequent, rather than occasional, basis.

The ALJ's reliance in part on evidence of normal shoulder range of motion to find unpersuasive a limitation on forward and lateral reaching with Plaintiff's right arm is arguably a closer call.  *Cf.  Jennifer A.*, 2019 WL 569830, at *11 ("In *Combs*, the ALJ erred not because he considered the relevance of treatment notations, but because the notations *were ambiguous for the purpose for which the ALJ applied them*.").  In light of the Court's conclusion regarding the handling and fingering limitations, however, this matter will be remanded for reconsideration of the persuasiveness of the state agency medical consultants' prior administrative medical findings at step four.

To be sure, the ALJ's discussion of the medical evidence demonstrates that the ALJ thoroughly considered the array of evidence in this case related to Plaintiff's physical impairments. *See* Tr. 16-20.  It may very well be that there are good reasons for concluding that the state agency medical consultants' prior administrative medical findings with respect to Plaintiff's use of her right upper extremity are inconsistent with or unsupported by other evidence in the record and therefore unpersuasive, such as, for example, whether the prior administrative medical findings espouse greater limitations than Plaintiff actually exhibits in her daily living.  *See, e.g.*, *Fentress*, 854 F.3d at 1021; *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012).  On remand, the ALJ shall take care to consider the persuasiveness of the prior administrative medical findings in a way that does not result in impermissible inferences being drawn from the medical evidence.

## C.  Mental Limitations

### 1.  Medical Evidence

Plaintiff also has a history of anxiety and depression.  *See, e.g.*, Tr. 1115-16, 1113-14, 1109; *see also* Tr. 830 ("Has been on antidepressant for many years.").  Plaintiff's pain compounded her depression.  Tr. 1092; *see also* Tr. 948 ("She looks pretty depressed because of her pain symptoms and suggesting that her anxiety gets flared up from time to time because of the severe pain."); Tr. 946 ("gets teary talking about her difficulties and states she gets depressed and anxious"); Tr. 1397 ("she is depressed about her pain not getting better").  Among other medications, Plaintiff has been prescribed

Lexapro[7], Wellbutrin[8], duloxetine[9], and lorazepam[10].  *See, e.g.*, Tr. 1113-14, 1109, 1100-04, 999 (Wellbutrin); Tr. 1009, 1003, 997, 955 (duloxetine); Tr. 952, 954 (lorazepam); Tr. 831 (Lexapro); *see also* Tr. 824-25.  Plaintiff reported that Wellbutrin was beneficial. *See, e.g.*, Tr. 1113, 1109, 1644.

### a.  2015

In June 2015, Plaintiff was referred for a psychiatry consultation.  Tr. 824; *see* Tr. 831.  Plaintiff complained of "post partem depression that ha[d] not gone away with [the birth of her second] child," who was now 21 years old.  Tr. 824.  *But see* Tr. 1310 (reporting diagnosis of depression about a year after second child was born).  Plaintiff was noted to be alert and oriented, casually groomed, cooperative, pleasant, and calm, with good eye contact.  Tr. 826.  Plaintiff's speech, thought processes, and attention/concentration were normal.  Tr. 826.  Her mood was depressed and her affect had full range and was congruent to the content of her speech.  Tr. 826.  Plaintiff was diagnosed with depression and noted to be experiencing a number of situational stressors, including strained finances, relationship issues, and chronic pain.  Tr. 826.  During a follow-up appointment approximately three weeks later, Plaintiff reported that she had not noticed any improvement with Lexapro and the dosage was increased.  Tr. 822-23.

---

[7] Lexapro is a brand name for escitalopram, a medication used to treat depression and anxiety.  *Escitalopram*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a603005 html (last accessed Mar. 30, 2022).

[8] Wellbutrin is a brand name for bupropion, a medication used to treat depression, among other things.  *Bupropion*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695033 html (last accessed Mar. 30, 2022).

[9] Duloxetine is used to treat, among other things, depression, anxiety, and fibromyalgia.  *Duloxetine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a604030.html (last accessed Mar. 30, 2022).  Cymbalta is a brand name for duloxetine.  *Id.*

[10] Lorazepam is used to treat anxiety.  *Lorazepam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682053 html (last accessed Mar. 30, 2022).

In early December, it was noted that Plaintiff had "just lost her job due to her personality conflicts" and was in need of counseling.  Tr.  816; *see also* Tr. 787.  The following week, Plaintiff, who is a registered nurse, reported that she had "been fired from one job for 'slapping a patient'" and was having "a difficult time getting hired now."  Tr. 811; *see also* Tr. 787.  Plaintiff reported "very poor motivation" and concentration, indicating that she sleeps all day.  Tr. 811.  It was noted that Plaintiff was "very fixated on multiple[]physical complaints" and was "quite histrionic when speaking about her physical ailments."  Tr. 811.  "[I]t [wa]s very hard to get her off the topic of physical complaints."  Tr. 811.  Plaintiff was noted to be alert and oriented, well groomed, calm, and cooperative with good eye contact.  Tr. 813.  There were "no obvious problems with attention, concentration, language, recent or remote memory although these were not formally tested."  Tr. 813.  Plaintiff was to begin taking Savella[11] and followed by Wellbutrin a week later.  Tr. 813.

### b.  2016

At her next appointment in February 2016, Plaintiff reported that she was "not doing too bad."  Tr. 787.  Plaintiff "spen[t] the majority of [the] session complaining about how all of the doctors she has been seeing have not been 'running further testing on her for her medical ailments.'"  Tr. 787.  Plaintiff was "very eager to have medical diagnosis" and was "very eager for medical care and attention."  Tr. 787.  Concerns were expressed for factitious disorder.  Tr. 787.  Similar mental status examinations were

---

[11] Savella is a brand name for milnacipran, a medication used to treat fibromyalgia.  *Milnacipran*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a609016.html (last accessed Mar. 30, 2022).

made. *Compare* Tr. 790 *with* 813. Plaintiff was instructed to discontinue Savella, increase Wellbutrin, and continue with Lexapro. Tr. 790.

During an appointment with her primary care provider approximately ten days later, Plaintiff requested an increased dose of Ritalin.[12] Tr. 786. Notes from the visit indicate that Plaintiff's "mentation appears normal" and she was told that this medication would be managed by psychiatry. Tr. 786. Plaintiff was again noted to be "[s]omatic." Tr. 786.

When Plaintiff was seen in early March for a recheck of her medications, the provider noted:

> At the last appointment she refused to let me start her on Cymbalta[13] and come off of the Lexapro though only a few days later she went to her primary care provider and asked her to place her on the Cymbalta and take her off the Lexapro. She has been splitting between providers. I did tell her that she could not go to one provider and another and ask[] for different things. She did appear to be embarrassed when I talked to her about this.

Tr. 779. During this visit, Plaintiff's mood was more depressed, but her mental status exam was otherwise the same. *Compare* Tr. 782 *with* 790. Plaintiff was prescribed Cymbalta in addition to Lexapro. Tr. 782

At her next recheck in mid-April, Plaintiff reported improvement with her depression. Tr. 767. Her motivation improved and she had less anxiety. Tr. 768. Plaintiff "still appear[ed] a bit anxious and [wa]s quite fixated on physical complaints which is not new for her." Tr. 767. Plaintiff "still fixate[d] on her right hip pain and

---

[12] Ritalin is a brand name for methylphenidate, which is used to treat, among other things, attention deficit hyperactivity disorder. *Methylphenidate*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682188 html (last accessed Mar. 30, 2022).
[13] *See supra* n.9.

other times she complain[ed] of multiple other types of pain including stomach pain and wrist pain knee pain, many other symptoms." Tr. 767. Plaintiff was "often looking to get multiple workups done for all of this pain." Tr. 768. When speaking about [the] possibility [of] having 'something really wrong with [her]' she becomes a little more elated and her mood [sic]." Tr. 768. This suggested the possibility of a factitious disorder, and "[i]t is very [d]ifficult to treat factitious disorder." Tr. 768. Plaintiff's mood was noted to be anxious and her Cymbalta dose was increased. Tr. 769. The findings from Plaintiff's mental status examination were otherwise similar to previous examinations. Tr. 769.

In December 2016, Plaintiff reported increased depression and anxiety. Tr. 1087-88.

### c. 2017

In early March 2017, it was noted that Plaintiff had "a positive response to self harm question" during a depression assessment. Tr. 1073. Plaintiff explained that she felt like a burden to others and that she had no purpose. Tr. 1073. In mid-April, Plaintiff requested a referral to a psychiatrist for depression and medication management, noting increased depression. Tr. 1070. When Plaintiff saw Dr. Durie again approximately five weeks later, she commented that she had "been so busy lately she hasn't really dwelled in the depression," stating that she was "[g]enerally a happy person, but it would only take a little thing sometimes to ruin her day." Tr. 1044. Plaintiff was, however, "concerned about [the] reliability of her memory, etc with regard to workability" and Dr. Durie made another referral to psychiatry. Tr. 1044. In November, Plaintiff mentioned during a pain

management appointment that she has a "much better understanding of managing [her] anxiety."  Tr. 976.

### d. 2018

Plaintiff resumed therapy sessions with Todd A. Heggestad, MS, LP, in July 2018. Tr. 1293.  Heggestad noted that Plaintiff "talk[ed] about a number of health issues that are significant and concerning to her" as well as various other stressors related to her home, adult children, and ex-husband.  Tr. 1293.  Plaintiff was "distressed by the health issues that she [wa]s experiencing and the impact it has on her life."  Tr. 1293. Heggestad diagnosed Plaintiff with "adjustment reaction with depressed mood and anxiety" and recommended sessions every other week for six months.  Tr. 1294.

Plaintiff was seen for medication management in mid-July.  Tr. 1309.  Plaintiff reported that "she is in a much better place than she had been before," noting that she received a diagnosis of fibromyalgia the day before and was "quite relieved that this has been officially diagnosed."  Tr. 1309; *see also* Tr. 1310 ("She also reported leaps and bounds in improvement since the last appointment.").  Plaintiff was speaking at a "rather fast pace[]," "almost pressured."  Tr. 1310-11.  The existence of bipolar disorder or borderline personality disorder was considered.  Tr. 1310, 1314.  Plaintiff was otherwise noted to be dressed appropriately with adequate grooming and was cooperative.  Tr. 1311.  Her mood was described as "much better" and her affect was "bright, animated."

Tr. 1311.  Plaintiff's memory was "seemingly intact."  Tr. 1311.  Paroxetine[14] was discontinued and Plaintiff was directed to continue with Wellbutrin.  Tr. 1314.

During her next session with Heggestad at the end of July, she and Heggestad "focused [on] wellness behaviors," including healthy sleep habits.  Tr. 1338.  When asked about her physical activity, Plaintiff "describe[d] herself as very active with household tasks and taking care of her animals."  Tr. 1338.  Plaintiff did report "that she feels scattered at times," to which Heggestad suggested that Plaintiff "look[] at task accomplishment over a week[']s period of time and, due to her chronic pain, pacing of activity."  Tr. 1388.  Financial stressors continued to be "prominent."  Tr. 1338.

During a general medical appointment in early October, Dr. Durie noted: "Memory is terrible; difficult focusing and concentrating."  Tr. 1374.

### e.  2019

At the end of May 2019, Plaintiff was brought to the emergency room by law enforcement for a psychological evaluation after "threatening to shoot herself with a gun."  Tr. 1622, 1624; *see also* Tr. 1628, 1633, 1644, 1652, 1659.  At the emergency room, she denied making this statement.  Tr. 1624, 1659.  *But see* Tr. 1628, 1633.  Plaintiff was "agitated/pacing in [the] room and confronting [emergency room] staff."  Tr. 1627, 1648.  She had "near-constant, pressured speech" and "[a]ppear[ed] disheveled."  Tr. 1627, 1648; *see* Tr. 1644, 1652.  Plaintiff denied having a mental health history.  Tr. 1629, 1633.  Plaintiff's "alcohol level was 0.15, twice legal limit."  Tr. 1644;

---

[14] Paroxetine is used to treat, among other things, depression and anxiety.  *Paroxetine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a698032.html (last accessed Mar. 30, 2022).

*see also* Tr. 1651.  Plaintiff was admitted on a 72-hour hold.  Tr. 1644. The following day, Plaintiff was noted to have a "brighter affect and [was] friendly to staff and peers." Tr. 1662.  The next day, Plaintiff was noted to be "in a pleasant mood" and discharged that day.  Tr. 1664.

While being hospitalized, Plaintiff mentioned "putting her garden together."  Tr. 1661.  Plaintiff identified a number of coping skills, including cooking, gardening, and playing games on her phone, and identified going outside and her animals as things that were satisfying in her life.  Tr. 1664, 1750.

At the end of September, Plaintiff returned to Heggestad "after a 6 month gap in service," although she had "been in contact via MyHealth messages."  Tr. 311.  Their conversation focused primarily on Plaintiff's relationship with her significant other.  Tr. 311-12; *see also* Tr. 270.  Plaintiff "note[d] ongoing pain difficulties but tries to keep occupied with her rabbits and chickens."  Tr. 312.  At their next session in early October, they continued to discuss Plaintiff's relationship as well as her upcoming disability hearing.  Tr. 302; *see also* Tr. 270.

### 2. Opinion Evidence

At both the initial and reconsideration levels, it was noted that Plaintiff failed to return forms to the state agency adjudicators and medical opinions were to be rendered based on the medical records in the file.  Tr. 414, 429, 446, 459.  On both initial review and reconsideration, the state agency psychological consultants stated they were unable to complete the psychiatric review technique and opine on Plaintiff's mental functioning due to insufficient evidence.  Tr. 420, 435, 450, 463.

### 3.   Limitations Attributable to Non-Severe Impairments

Plaintiff asserts that the ALJ erred by failing to include any mental limitations in her residual functional capacity.  Plaintiff asserts that, at step two, the ALJ found that she had mild limitations in three of the four areas of mental functioning (understanding, remembering or applying information; interacting with others; and adapting or managing oneself),[15] yet "the failed to include *any* mental limitations at all in the [residual functional capacity]."  Pl.'s Mem. in Supp. at 28; *see* Tr. 13-14.  Plaintiff asserts that her "medical records provide evidence that indicate mental limitations are warranted," citing to, among other things, past diagnoses of depression, personality disorder, and suspected factitious disorder; reported symptoms of poor concentration, fatigue, depressed mood, and anxiety; difficulty getting along with others after losing one job to "personality conflicts" and another after "slapping a patient"; and observations that she was emotional, agitated, and fixated on her physical complaints.

Plaintiff has not challenged the ALJ's conclusion that her medically determinable impairments of factitious disorder, depression, anxiety, and personality disorder are non-severe impairments.  In concluding that these impairments were non-severe, the ALJ used the technique outlined in the regulations to assess the degree of functional limitation in each of the four areas of mental functioning.  Tr. 13-14.  *See generally* 20 C.F.R. §§ 404.1520a, 416.920a.  Social Security Ruling 96-8p states, and the ALJ expressly recognized, that the limitations identified through this evaluative technique "are not a[

---

[15] The ALJ found that Plaintiff had no limitation in the remaining area of concentrating, persisting, or maintaining pace.  Tr. 14.  *See generally* 20 C.F.R. §§ 404.1520a(c), 416.920a(c) (evaluation of mental impairments).

residual-functional-capacity] assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, No. SSR 96-8p, 1996 WL 374184, at *4 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-8p]; *see* Tr. 14. This is because the determination of claimant's residual functional capacity at step four "requires a more detailed assessment" than the evaluative technique at step two. SSR 96-8p, 1996 WL 374184, at *4; *Vickie R. v. Saul*, No. 19-cv-2530 (ADM/ECW), 2021 WL 536297, at *12 (D. Minn. Jan. 28, 2021), *report and recommendation adopted*, 2021 WL 533685 (D. Minn. Feb. 12, 2021); *see Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006); *see also Chismarich*, 888 F.3d at 980.

At the same time, the determination of a claimant's residual functional capacity "must be based on all the relevant evidence in the case record," including any non-severe impairments. *Igo v. Colvin*, 839 F.3d 724, 730 (8th Cir. 2016) (quotation omitted); *see* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (considering all medically determinable impairments even those that are not severe when determining residual functional capacity). SSR 96-8p states that an ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5. SSR 96-8p explains:

> While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may

> prevent an individual from performing past relevant work or
> may narrow the range of other work that the individual may
> still be able to do.

*Id.*

Plaintiff has alleged disability in part based on her mental impairments (depression and anxiety) and, although concluding they were non-severe, the ALJ found Plaintiff to have the medically determinable mental impairments of depression and anxiety as well as factitious disorder and personality disorder.   While the ALJ extensively discussed the medical evidence in the record regarding Plaintiff's physical impairments when explaining the residual-functional-capacity determination, the ALJ provided hardly any discussion of Plaintiff's mental impairments.   The little discussion that was provided was primarily, as Plaintiff points out, in regard to the intensity, persistence, and limiting effects of her alleged physical symptoms and why more restrictive physical limitations were not warranted:

> However, further restrictions are not supported.   Previous
> medical providers have noted that [Plaintiff] has been quite
> histrionic when speaking about physical ailments, has been
> very eager for medical care and *attention*, and has been a little
> more elated when speaking about having something wrong
> with her.   These observations led to the diagnosis of factitious
> disorder, which, while non-severe for the reasons discussed
> . . . [at step two] above, still strongly suggests that [Plaintiff]
> overstates the intensity, persistence, and limiting effects of
> her symptoms.

Tr. 17 (citations omitted); *see also* Tr. 19.

The Commissioner contends that the use of the technique at step two to rate the degree of limitation in the four broad areas of mental functioning is "relevant" to the

ALJ's residual-functional-capacity determination. Comm'r's Mem. in Supp. at 26. "As a general proposition, this assertion is unobjectionable and correct." *Chismarich*, 888 F.3d at 979-80; *see Patricia M. v. Saul*, No. 18-cv-3462 (DSD/HB), 2020 WL 3633218, at *3 (D. Minn. Feb. 5, 2020), *report and recommendation adopted sub nom. McArdell v. Saul*, 2020 WL 1951748 (D. Minn. Apr. 23, 2020). When discussing the opinions of the state agency psychological consultants, the ALJ observed "the record contains ample evidence regarding [Plaintiff's] mental functioning," referring back to the prior step-two analysis. Tr. 19. But the ALJ did not explain how that evidence of Plaintiff's mental functioning was considered in the determination of Plaintiff's residual functional capacity in a manner that allows the Court to determine whether the absence of any mental limitations was supported by substantial evidence in the record as a whole, especially considering that evidence supported a finding of some limitation at step two. *See Mark J. E. v. Kijakazi*, No. 20-cv-2047 (PAM/JFD), 2021 WL 6066260, at *10 (D. Minn. Dec. 7, 2021), *report and recommendation adopted*, 2021 WL 6063631 (D. Minn. Dec. 22, 2021*). Contra Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004).

It may also be, as the Commissioner contends, that the findings made by the ALJ at step two "harmonize with the ALJ's residual functional capacity, which did not include mental limitations." Comm'r's Mem. in Supp. at 19. *Cf. Michael R. v. Berryhill*, No. 18-cv-241 (NEB/KMM), 2019 WL 5149978, at *7-8 (D. Minn. June 11, 2019), *report and recommendation adopted*, 2019 WL 4233852 (D. Minn. Sept. 6, 2019). But, without an explanation as to how Plaintiff's non-severe mental impairments and evidence of her mental functioning were considered in the determination of Plaintiff's residual functional

capacity, the Court is left to speculate as to the reasons why mental limitations were not included.  This the Court cannot do.  *See Encino Motorcars, LLC*, 579 U.S. at 224.

Therefore, the Court will additionally remand this matter for consideration of what limitations or restrictions, if any, are imposed by Plaintiff's non-severe mental impairments in the assessment of her residual functional capacity at step four.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p, 1996 WL 374184, at \*5.  Relatedly, "[a]n ALJ may rely on a vocational expert's response to a properly formulated hypothetical question to meet [the Commissioner's] burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform."  *Kraus v. Saul*, 988 F.3d 1019, 1026 (8th Cir. 2021) (quotation omitted); *see Swedberg v. Saul*, 991 F.3d 902, 906 (8th Cir. 2021) ("Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." (quotation omitted)).  An ALJ need only include "those impairments and limitations he [or she] found to be supported by the evidence as a whole in his hypothetical to the vocational expert."  *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quotation omitted).  On remand, following consideration of what limitations or restrictions, if any, are imposed by Plaintiff's non-severe mental impairments in the assessment of her residual functional capacity, the ALJ should consider whether the hypotheticals posed to the vocational expert were impacted and if they continue to encompass all relevant limitations.  *See Swedberg*, 991 F.3d at 906; *Nash*, 907 F.3d at 1090; *Mark J. E.*, 2021 WL 6066260, at \*11.

The Court declines to address whether the ALJ will need to develop the record further on remand. "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994); *see Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012) ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work."). "The ALJ is required to order medical examinations and tests only if the medical records presented to him [or her] do not give sufficient medical evidence to determine whether the claimant is disabled." *Halverson*, 600 F.3d at 933 (quotation omitted). Thus, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber*, 22 F.3d at 189; *see Hey v. Colvin*, 136 F. Supp. 3d 1021, 1046 (D. Minn. 2015) ("An ALJ does not fail in his [or her] duty to develop the record if substantial evidence exists to allow the ALJ to make an informed decision."). Without knowing the basis for the ALJ's decision not to include any mental limitations in Plaintiff's residual functional capacity, the Court is unable to make a determination as to whether the existing medical evidence was sufficient.

## VI. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 23, is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 25, is **GRANTED IN PART** and **DENIED IN PART**.

3. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March____31____, 2022                    _____*s/ Tony N. Leung*_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota


                                                *Karin R. Kijakazi*
                                                Case No. 20-cv-1994 (TNL)